# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LAVELLE EARL LOWE,

    Plaintiff,

  v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

    Defendant.

_____/

Case No. 1:17-cv-00349-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.    INTRODUCTION

On March 9, 2017, Plaintiff Lavelle Earl Lowe ("Plaintiff") filed a complaint under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") benefits. (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 8.)

## II. BACKGROUND

On December 5, 2012, an application for SSI was filed on behalf of Plaintiff, who was then a child under the age of 18. (Administrative Record ("AR") 169 (Plaintiff was born on April 11, 1996).) The application alleged that Plaintiff became disabled on October 28, 1999, due to seizures, asthma, problems with comprehension and short term memory, depression, self-abuse, and general behavior and learning disabilities. (AR 200.) Plaintiff turned 18 prior to the date of the decision issued by the Administrative Law Judge ("ALJ") on September 18, 2015. (AR 11.)

### A. Relevant Medical Evidence[3]

#### 1. Valley Children's Hospital

On September 4 and October 27, 1998, Plaintiff, who was then two years old, and Plaintiff's mother, Tiffany Wright, presented at Valley Children's Hospital for a psychological evaluation. (AR 284.) Plaintiff was exhibiting aggressive and oppositional behavior, and had attempted to stab a four-year-old with a knife. (AR 284.) Plaintiff's mother reported that Plaintiff was able to form two and three word sentences, feed himself, had "fine" motor coordination, and played well by himself. (AR 285.) However, Plaintiff tended to be hyperactive, had a short attention span, had difficulty interacting with others, and was easily frustrated. (AR 285.) Clinical psychologist Lisa Miller, Ph.D. diagnosed Plaintiff with Attention Deficit Hyperactivity Disorder ("ADHD"). (AR 284.)

On December 31, 1998, Dr. Miller noted that Plaintiff was "a bright child," and "[t]herefore . . . is well aware with whom he can get away with behaviors and with whom he cannot." (AR 282.) Dr. Miller diagnosed Plaintiff with ADHD and Oppositional Defiant Disorder, and she suggested that Plaintiff be enrolled in Head Start. (AR 282-83.)

On March 11, 1999, Plaintiff's mother returned to Dr. Miller, complaining that Plaintiff was engaging in aggressive and regressive behavior after she had taken away his pacifier. (AR 278.) Dr. Miller was hopeful that Plaintiff's behavior would improve once he had his scheduled tonsillectomy and had tubes placed in his ears. (AR 278.) Dr. Miller referred Plaintiff to a

---

[3] As Plaintiff's assertions of error are limited to the ALJ's discrediting of the medical opinion of Nirmal Brar, M.D., and the lay witness testimony of Plaintiff's mother, two grandmothers, and cousin, only evidence relevant to those arguments is set forth below.

2

psychiatrist to determine whether Ritalin should be added to his medication regime. (AR 279.) Dr. Miller continued to provide parenting counseling to Plaintiff's mother and to assist Plaintiff with "self-control issues" through July 1999. (AR 275-78.)

**2.    Clinica Sierra Vista**

The medical evidence in the record picks up several years later. On July 8, 2011, Plaintiff, who was then fifteen years old, presented at Clinica Sierra Vista, complaining of lack of appetite. (AR 300.) Plaintiff denied trying to lose weight, and reported that he sleeps at 11 p.m., wakes up at 11 a.m., and plays video games all day. (AR 300.) Kami Jow, M.D. noted that Plaintiff gets irritated easily. (AR 300.)

On October 5, 2011, Plaintiff underwent a physical examination by Dr. Jow. (AR 294.) The examination revealed that Plaintiff had been prescribed albuterol and advair, but that he had been off his medications since the beginning of the year. (AR 294.) Dr. Jow noted that all of Plaintiff's functions were normal, but assessed Plaintiff with asthma, psychosis, a learning disorder and a history of ADHD, which had been resolved. (AR 294.)

Two years later, on May 30, 2013, Plaintiff, then 17 years old, returned to Clinica Sierra Vista for a check-up. (AR 391-95.) Plaintiff complained sleep difficulty. (AR 391.) Sudhakar Nadipally, M.D., diagnosed mood changes and referred Plaintiff for a psychiatric consultation. (AR 394.)

On August 21, 2013, Plaintiff presented at Clinica Sierra Vista with a fracture of his right hand. (AR 382-84.) Plaintiff reported that he had been upset after a classmate touched him, and he had punched doors and walls at school. (AR 384.) Plaintiff was treated with an arm splint and referred to a psychiatrist. (AR 384.)

**3.   Nirmal S. Brar, M.D.**

On September 7, 2013, Plaintiff underwent a psychological evaluation with Nirmal Brar, M.D., who had previously seen Plaintiff in 2008. (AR 410-12.) Plaintiff's mother reported that Plaintiff fights, destroys property, is emotional and nervous, and suffers severe mood swings, anger, and memory loss. (AR 410.) Plaintiff previously fractured his hand twice by hitting walls. (AR 410.) He suffers variable sleep patterns, staying awake for two to three days followed by

3

sleeping for nine hours. (AR 410.) Plaintiff reported that he experiences visual hallucinations of people being killed and hears voices commanding him to break things and hurt people. (AR 410.) Plaintiff experiences these hallucinations more during periods of sleeplessness. (AR 410.) Dr. Brar assessed Plaintiff's insight, attention, and concentration as poor. (AR 411.) Dr. Brar diagnosed Plaintiff with a reading learning disorder and psychosis, not otherwise specified but ruling out bipolar disorder, and prescribed Risperdal. (AR 411-12.)

On September 10, 2013, Plaintiff returned to Dr. Brar. (AR 408.) Dr. Brar observed that Plaintiff was properly oriented, denied hallucinations, and exhibited good judgment, an appropriate attitude, and normal psychomotor activity and speech. (AR 408.)

On September 17, 2013, Plaintiff reported severe mood swings and hallucinations. (AR 406.) Dr. Brar examined Plaintiff and observed again that Plaintiff was properly oriented, denied hallucinations, and exhibited good judgment, an appropriate attitude, and normal psychomotor activity and speech. (AR 406.) However, Dr. Brar increased Plaintiff's dosage of Risperdal. (AR 406.)

On September 24, 2013, Plaintiff complained that the medication was not working. (AR 404.) Plaintiff was still hearing voices commanding him to hurt people, visually hallucinating, and sleeping "too much." (AR 404.) Dr. Brar observed that Plaintiff was properly oriented, exhibited good judgment, an appropriate attitude, and normal psychomotor activity and speech, but that he had poor attention and concentration. (AR 405.) Dr. Brar increased Plaintiff's dosage of Risperdal. (AR 405.)

On October 8, 2013, Plaintiff complained that he continued to feel "sleepy," but reported that he had been sleeping nine hours a night. (AR 402.) Plaintiff further reported that he had not fought anyone recently, had been playing football seven days a week, and heard voices only when he fails to take his medication. (AR 402.) Plaintiff's mother reported that Plaintiff was less agitated and had not been hearing voices. (AR 402.) Dr. Brar observed that Plaintiff was properly oriented, denied hallucinations, exhibited fair to good judgment, an appropriate attitude, and normal psychomotor activity and speech, but that he had poor attention and concentration. (AR 403.)

On November 12, 2013, Plaintiff complained that he was sleeping only three to four hours a night and continued hearing command voices at night. (AR 453.) He gets angry around people his age, and, in those moments, he feels suicidal and punches holes in the wall. (AR 453.) However, Plaintiff reported that he was on his school's track team, and his mother reported that Plaintiff was doing better than before. (AR 453.)

On November 26, 2013, Plaintiff reported that he was having fewer hallucinations, and he was less angry because the medication was making him so sleepy. (AR 451.)

On February 5, 2014, Plaintiff reported hearing command voices and having suicidal ideation. (AR 448.) He had written on Facebook that he no longer feels like living. (AR 448.) Plaintiff was also having difficulty complying with his medication. (AR 448.) Plaintiff's mental health examination revealed auditory hallucinations, poor insight, and poor attention. (AR 449.) On February 11, 2014, after Plaintiff again reported hearing command voices, Dr. Brar increased Plaintiff's dosage of Risperdal. (AR 445.)

On March 11, 2014, Plaintiff reported that he was not taking his medications, and that he continued hearing voices. (AR 433.) Plaintiff also reported that he was fighting less. (AR 433.) Dr. Brar noted that Plaintiff was properly oriented, had an appropriate attitude and fair to good judgment, exhibited normal psychomotor activity and speech, denied hallucinations, and had poor attention or concentration. (AR 444.)

On April 16, 2014, Plaintiff reported recently trying to cut himself with a knife after an argument with his mother. (AR 440.) Although Plaintiff had been compliant with his medication, he continued to hear voices intermittently, get mad at others, and "get off" on people who upset him. (AR 440.)

On July 14, 2014, Plaintiff requested an increase of his medication. (AR 436.) Plaintiff stated that the voices he hears were "getting grouchy and irritated," and that he was almost violent with his girlfriend. (AR 437.) Dr. Brar prescribed Lamictal. (AR 438.)

Between September and December 2014, Plaintiff reported increased anger and auditory hallucinations commanding him to hurt people, but that he was able to distract himself from acting on the commands. (AR 427, 431, 433.) Plaintiff also reported visual hallucinations and

suicidal ideation. (AR 427-28.) Plaintiff had not been consistent with his medications and his sleep suffered as a result. (AR 433.) Dr. Brar increased Plaintiff's dosage of Lamictal. (AR 429-30.)

In February 2015, Plaintiff reported continued auditory hallucinations commanding him to hurt himself and occasionally others. (AR 423, 425.) Plaintiff also reported experiencing suicidal ideation approximately five times a month, poor sleep, and visual hallucinations. (AR 423, 426.) A mental status examination revealed that Plaintiff exhibited normal psychomotor activity and speech, experienced auditory hallucinations, was properly oriented, and had an appropriate attitude, fair to good judgment, good attention and concentration, and poor insight. (AR 424.) Plaintiff's dosages of Lactimal and Risperdal were increased. (AR 424, 426.)

Between March and May 2015, Plaintiff reported being "angry" and hearing command voices to hurt others. (AR 421.) By April, Plaintiff's auditory hallucinations had lessened to about an hour each episode. (AR 419.) By May, Plaintiff reported that the medicine was working, he was rarely having visual hallucinations, and was hearing command voices two to three times a week. (AR 417.) Dr. Brar noted that Plaintiff was properly oriented, exhibited normal psychomotor activity and speech, and had an appropriate attitude, fair to good judgment, and good attention or concentration. (AR 418, 420, 422.)

On June 9, 2015, Plaintiff, then 19 years old, reported that he had not refilled his medications in two months, but that he had been compliant with his medications. (AR 414.) Plaintiff also reported that he was having no visual hallucinations recently, but that he was hearing voices two to three times a week and having difficulty initiating sleep. (AR 414.) Dr. Brar noted that Plaintiff was properly oriented, exhibited normal psychomotor activity and speech, denied hallucinations, and had an appropriate attitude, good judgment, and fair to poor attention or concentration. (AR 415.)

### 4. State Agency Physicians

On May 21, 2013, E. Murillo, M.D., a non-examining state agency medical consultant concluded that Plaintiff, who was then 17 years old, had less than marked limitations in acquiring and using information, marked limitations in attending and completing tasks, and no limitations

6

in interacting and relating with others, moving about and manipulating objects, caring for himself, and in health and physical well-being. (AR 85-86.)

On January 3, 2014, E. Aquino-Caro, M.D., affirmed Dr. Murillo's opinion. (AR 96-99.) Dr. Aquino-Caro found that Plaintiff had less than marked limitations in acquiring and using information, marked limitations in attending and completing tasks, no limitations in interacting and relating with others, no limitations in moving about and manipulating objects, and no limitations in caring for himself and his health and physical well-being. (AR 96-99.)

**B.     Third-Party Statements**

On July 31, 2015, Plaintiff's mother, Tiffany Wright, submitted a third-party statement on behalf of Plaintiff's SSI application. (AR 265-66.) Ms. Wright described Plaintiff's various behavioral problems, including setting fires, breaking windows, damaging vehicles, punching holes in walls, attempting to stab his cousin twice, and physically threatening his girlfriend. (AR 265-66.)

On August 1, 2015, Plaintiff's grandmother, Vicky Alberty, submitted a third-party statement, as well. (AR 268.) Ms. Alberty stated that Plaintiff has "temper fits," difficulty coping with others, and is unable to care for himself. (AR 268.) He breaks items in the home, cries, punches holes in the wall, and hurts himself. (AR 268.)

On August 2, 2015, Plaintiff's other grandmother, Sharon Taylor, submitted a third-party statement on Plaintiff's behalf, describing his difficulties. (AR 270-71.) Ms. Taylor stated that Plaintiff is "a walking time bomb," and the family is careful to not agitate him. (AR 270.)

Finally, on August 3, 2015, Plaintiff's cousin, Felicia Pearson, submitted a third-party statement. (AR 273.) Ms. Pearson has witnessed Plaintiff's behavioral problems for years, including destroying toys, closes and video games, punching holes in walls, and attempting to hurt himself. (AR 273.) Plaintiff is antisocial, often shuts down, and will become angry when confronted. (AR 273.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application for SSI initially on June 18, 2013, and again on reconsideration on January 7, 2014. (AR 103-07, 111-15.) Consequently, on February

24, 2014, Plaintiff requested a hearing before an ALJ. (AR 116-18.) At the hearing on August 4, 2015, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions. (AR 11; *see generally* AR 11-26.)

### 1. **Plaintiff's Testimony**

Plaintiff testified that he hears voices and experiences anger, depression, and insomnia. (AR 42-43.) He also has difficulty with concentration (he can concentrate for five minutes at most), attention, and learning comprehension. (AR 41, 44.) Plaintiff testified that he hears voices daily that command him to hurt himself and others. (AR 42-43.) During his episodes of anger, Plaintiff steals, punches walls, attempts to hurt himself, and once attempted to run a dog over with his mother's car. (AR 47.) While in school, Plaintiff was bullied, had only one friend, and often fought with other students. (AR 48.) On one occasion, Plaintiff stabbed another student in the neck with a pencil. (AR 48.) Plaintiff's anger is intensified, and he hears voices more frequently, during his periods of insomnia. (AR 44.) During these periods, Plaintiff remains awake for up to three days and then sleeps for an entire 24-hour period. (AR 43.)

With regard to treatment, Plaintiff was taking Risperdal and Lamotrigine. (AR 43.) Plaintiff testified that, despite complying with his treatment regime, the medications had not improved his symptoms. (AR 43, 46, 53.) The medications caused increased drowsiness and leg spasms. (AR 43.) Plaintiff also received special education in school and he learned coping mechanisms, but he testified that they had not improved his symptoms. (AR 41, 52.) Plaintiff used a punching bag for a period of time that helped with his anger. (AR 51-52.)

Plaintiff testified that he lives with his mother. (AR 37.) He did not have a driver's license. (AR 37.) Plaintiff had completed high school and was considering attending Fresno City College. (AR 38.) With regard to his daily activities, Plaintiff testified that he showers and dresses himself, and performs some household chores, including emptying the trash, but he does not wash dishes, make his bed, shop, or cook. (AR 38-39, 46.) On a typical day, Plaintiff sleeps, watches television for as long as he can concentrate, and generally does not leave home. (AR 39-40.) With regard to social activities, Plaintiff "just stay[s] to [him]self." (AR 39.) He

8

has only one friend, with whom he plays basketball once every two weeks. (AR 49.) On days when Plaintiff is not experiencing depression or anger, he plays basketball alone three to four times a day. (AR 49-50.) Plaintiff also enjoys drawing and playing video games for as long as he can concentrate. (AR 39.)

### 2.     Testimony of Plaintiff's Mother

Plaintiff's mother, Ms. Wright, also testified at the hearing. (AR 54.) During the first few years of Plaintiff's life, he lived with his great-grandmother, Ms. Wright's grandmother, because Ms. Wright was working as a truck driver and "couldn't deal with hi[s] . . . crying and the behaviors." (AR 55-56.)

Ms. Wright described recent problems with Plaintiff's temper. She testified that during his episodes of anger or depression, he did not want to talk, eat, or leave home. (AR 57.) Ms. Wright also described Plaintiff's problematic behavior, including biting himself, punching holes in the walls, breaking windows, stabbing her car's convertible top, and setting fires in the home. (AR 58-59.) Ms. Wright testified that Plaintiff had threatened her on occasion and that he threatened to stab his ex-girlfriend and tried to set her on fire. (AR 62.)

### 3.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Since Plaintiff had no past work, the ALJ asked the VE whether a hypothetical person of Plaintiff's age and education could perform any work if such a person had no exertional limitations, but was restricted to simple routine tasks. (AR 63.) The VE testified that such a person could perform "the world of unskilled work at all exertional levels." (AR 63.)

The ALJ asked the VE a second hypothetical question considering the same person outlined in the first hypothetical, who had no exertional limitations, but was restricted to simple routine tasks and occasional public contact. (AR 63.) The VE testified that such a person would be able to perform the following jobs: (1) housecleaner, Dictionary of Operational Titles ("DOT") code 323.687-018, which was heavy and unskilled work, with a specific vocational preparation ("SVP") of 2, for which there exists 190,000 jobs nationally; (2) housekeeping, cleaner, DOT code 323.687-014, which was light and unskilled work, with an SVP of 2, for

which there exists 230,000 jobs nationally; and (3) conveyor feeder-offbearer, DOT 921.686-014, which was medium and unskilled work, for which there exists 30,000 jobs nationally. (AR 64.)

The ALJ asked the VE a third hypothetical question considering the same person with the same limitations as outlined in the second hypothetical, but with the added restriction of occasional contact with co-workers and supervisors (defined as "be[ing] in the same building," but "not . . . side-by-side."). (AR 64.) The VE testified that such a hypothetical person could perform the three jobs listed by the VE in response to the second hypothetical. (AR 64.)

The ALJ posed a fourth hypothetical question considering a person of Plaintiff's age and education, who had no exertional limitations but can have no contact with the public, co-workers, and supervisors. (AR 64.) The VE testified that there would be no available work for such a person. (AR 64.)

Finally, the ALJ posed a fifth hypothetical questions considering the same person with the same limitations outlined in the third hypothetical, but who could concentrate for only about an hour and then would be off task for about 15 minutes. (AR 65.) The VE testified that there would be no available work for such a person. (AR 65.)

**D.     The ALJ's Decision**

In a decision dated September 18, 2015, the ALJ found that Plaintiff was not disabled. (AR 11-26.) The ALJ conducted the three-step childhood disability analysis set forth in 20 C.F.R. § 416.924, and the five-step adult disability analysis set forth in 20 C.F.R. § 416.920.[4] (AR 12-15.) The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date, December 5, 2012. (AR 15.)

With regard to Plaintiff's relevant childhood period, the ALJ found that Plaintiff had the severe impairments of "learning disorder and schizophrenia, but rule[d] out bipolar." (AR 16.) The ALJ found, however, that the following impairments were non-severe: attention deficit hyperactivity disorder ("ADHD"); seizure disorder; asthma; fracture of Plaintiff's fifth

---

[4] The ALJ noted that Plaintiff was a child on December 5, 2012, the date the application was filed, and became an adult on April 10, 2014. (AR 15.)

metacarpal. (AR 16.) The ALJ further found that Plaintiff had no impairment or combination of impairments "that resulted in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning." (AR 23.) In reaching this finding, the ALJ considered the relevant medical evidence and opinions, Plaintiff's testimony, and third party statements by Plaintiff's mother, cousin, and both grandmothers. (AR 16-18.) The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms to be not fully credible where they conflicted with the residual functional capacity assessment. (AR 18.) The ALJ also afforded little weight to the third party statements by Plaintiff's mother, cousin, and two grandmothers. (AR 18.) The ALJ analyzed the record "in terms of the six domains of function," including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. (AR 18-23.) The ALJ concluded that Plaintiff was not disabled before the age of 18. (AR 16-23.)

With regard to Plaintiff's relevant adulthood period, the ALJ found that Plaintiff continued to have the severe impairments listed above but had not developed any new impairment after the age of 18. (AR 23.) The ALJ determined that, since the age of 18, Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform simple routine tasks with occasional contact with the public, coworkers, and supervisors, meaning he can be in the same building, but not working side by side.

(AR 24.) The ALJ found Plaintiff's statements under this analysis not entirely credible. (AR 24.) The ALJ also afforded little weight to the statements by Plaintiff's mother, cousin, and two grandmothers under this analysis. (AR 24.) The ALJ ultimately found, given Plaintiff's RFC, that he was not disabled because he could perform jobs that existed in significant numbers in the national economy. (AR 25.) Particularly, the ALJ found that Plaintiff could perform the jobs of house cleaner, housekeeping cleaner, and conveyer feeder off-bearer. (AR 25.)

//

Plaintiff sought review of this decision before the Appeals Council, which denied review on January 6, 2017. (AR 1-4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

**E.    Plaintiff's Appeal**

On March 9, 2017, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff claims that the ALJ failed to properly consider the opinion of treating psychiatrist Dr. Brar, and erred in discrediting the third-party statements by Plaintiff's mother, cousin, and grandmothers. (*See generally* Doc. 14 at 16-21.)

### III.    SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

### IV.    APPLICABLE LAW

**A.    Standard for Childhood Disability**

A child (defined as an individual under the age of eighteen) is considered disabled for

purposes of disability benefits if he or she is "unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (quoting 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)); *see also Hernandez v. Colvin*, No. 2:14-cv-2246 AC, 2016 WL 881118, at *3 (E.D. Cal. Mar. 8, 2016). The impairment or impairments must "result[] in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Moreno v. Berryhill*, No. CV 16-9145-KK, 2017 WL 4119064, at *1 (C.D. Cal. Sep. 14, 2017) (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)).

The ALJ must undertake a three-step sequential analysis in the process of evaluating a child's disability. In the First Step, the ALJ must determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924. If not, in the Second Step, the ALJ must determine whether the child has a severe impairment or a combination of impairments causing marked functional limitations. *Id*. If so, in the Third Step, the ALJ must determine whether the child has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. If so, the child ids found to be disabled, assuming the twelve-month duration requirement is also met. *Id*.

**B.     Standard for Adulthood Disability**

An adult is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B),

(D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

In his Opening Brief, Plaintiff contends that the ALJ failed to properly consider the opinion of treating psychiatrist Dr. Brar, and erred in discrediting the third-party statements by his mother, cousin, and grandmothers. (*See generally* Doc. 14 at 16-21.)

**A. Consideration of the Medical Opinion of Nirmal S. Brar, M.D.**

    **1. Plaintiff's Limitations in Interacting and Relating with Others**

Plaintiff first contends that the ALJ failed to explain her reasons for discrediting Dr. Brar's opinion that Plaintiff had limitations in interacting and relating with others. (Doc. 14 at 17.) Specifically, Plaintiff contends that the ALJ failed to address the conflict between Dr. Brar's treatment notes describing Plaintiff's violent behavior and the state agency physicians' opinions that Plaintiff had no limitation in interacting and relating with others. (Doc. 14 at 18.)

The ALJ must consider and evaluate every medical opinion of record. *See* 20 C.F.R. § 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Madrigal v. Berryhill*, No. CV 16-8714-E, 2017 WL 3120257, at *3 (C.D. Cal. Jul. 21, 2017). In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason." *Madrigal*, 2017 WL 3120257, at *3 (quoting *Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981)). Nor can the ALJ make his or her own lay medical assessment. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (a hearing examiner not qualified as a medical expert should not make his or her own exploration and assessment of a claimant's medical condition) (citation omitted).

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree v. Colvin*, No. 1:13-cv-01577-SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

Here, it is uncontested that Dr. Brar treated Plaintiff, and thus is considered a treating physician. (*See, e.g.*, AR 26.) "[C]lear and convincing reasons are required to reject the treating doctor's ultimate conclusions . . . Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record for so doing." *Lester v. Chater*, 81 F.3d 821, 830-31 (quotation marks and citations omitted). Nonetheless, "[t]he ALJ need not accept

the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

Plaintiff mischaracterizes Dr. Brar's treatment notes. While Dr. Brar's treatment notes do describe Plaintiff's episodes of punching walls, threatening his girlfriend, fighting at school, and pulling a knife on his cousin, they also describe a pattern of improved behavior as a result of Plaintiff's medications (AR 402, 417, 433, 451, 453), and indicate that Plaintiff had been playing football (AR 402) and was on his school's track team (453). The ALJ indicated as much in her decision, stating that "[t]he medical evidence showed some history of fighting and anger issues, but [Plaintiff] reported playing football and communicates well." (AR 21.) The ALJ also noted Plaintiff's participation in track. (AR 17.) Based upon this, the ALJ properly found that Plaintiff "had less than marked limitation in interacting and relating with others." (AR 21.) Dr. Brar's treatment notes concerning Plaintiff's ability to interact and relate with others—essentially that Plaintiff's participation in social activities such as track and football demonstrated his ability to interact with others—did not conflict with the opinion of the state agency physicians that Plaintiff had no limitations interacting and relating with others. *See*, *e.g.*, *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for . . . resolving conflicts in the medical testimony, and for resolving ambiguities. We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."). Therefore, the ALJ did not err in failing to resolve a non-existent conflict.

### 2. **Plaintiff's Concentration and Attention**

Plaintiff next contends that the ALJ failed to explain her reasons for discrediting Dr. Brar's opinion that Plaintiff had poor attention and concentration and instead crediting another medical opinion that Plaintiff's ADHD diagnosis was resolved. (Doc. 14 at 18.)

Plaintiff again mischaracterizes Dr. Brar's treatment notes. While Dr. Brar does note on several occasions that mental examinations revealed that Plaintiff had poor attention and concentration, Dr. Brar also notes on several of his most recent examinations of Plaintiff that Plaintiff had *good* attention and concentration. (AR 418, 420, 422, 424.) As such, Dr. Brar's

16

notes regarding Plaintiff's concentration and attention are not necessarily at odds with the ALJ's finding that Plaintiff's ADHD was resolved. *See McDonald v. Berryhill*, 1:16-cv-1477-SKO, 2018 WL 1142192, at *15 (E.D. Cal. Mar. 2, 2018) (finding that the ALJ did not commit error by failing to mention a doctor's findings where the doctor's findings were not inconsistent with the ALJ's findings); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) ("It is not necessary to agree with everything an expert witness says in order to hold that his testimony contains substantial evidence."); *Davis v. Comm'r of Soc. Sec.*, No. 2:12-cv-766-KJN, 2016 WL 3688416, at *4 (E.D. Cal. Jul. 11, 2016) ("The ALJ's RFC was not required to match the opinion of any particular source, and the ALJ is obligated to consider the record as a whole."). In particular, the ALJ found that Plaintiff's ADHD had resolved because he testified that he had not experienced symptoms related to ADHD since he was young, and that he had stopped taking any ADHD medication. (AR 20-24.)

As there was no inconsistency between Dr. Brar's notes regarding Plaintiff's concentration and attention and the ALJ's finding that Plaintiff's ADHD had resolved, as explained above, the ALJ did not discredit Dr. Brar's treatment notes. The Court therefore finds that the ALJ's consideration of Dr. Brar's treatment notes and opinion is supported by substantial evidence.

**B.     Consideration of the Third-Party Lay Witness Statements.**

The ALJ considered third-party lay witness statements submitted by Plaintiff's mother, Tiffany Wright, Plaintiff's grandmothers, Vicky Alberty and Sharon Taylor, and Plaintiff's cousin, Felicia Pearson, and afforded them "little weight." (AR 18.) The ALJ found that the statements conflicted with the objective medical evidence and opinions. (AR 18, 24.) Plaintiff contends that the lay witness statements are consistent with the medical evidence. (Doc. 14 at 19.)

Lay witness testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2010). Lay witness testimony cannot be disregarded without comment. *Stout v.*

*Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). In rejecting lay witness testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. *Lewis*, 236 F.3d at 512.

Here, the ALJ found that the lay witness statements were inconsistent with the medical evidence and medical opinions. (AR 18, 24.) The ALJ may reject statements made by other sources when they conflict with a claimant's abilities. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1163-64 (9th Cir. 2008); *see also* SSR 06-3p, 2006 WL 2329939, at *4 (the ALJ may consider "how consistent the opinion is with other evidence"). Each of the four lay witnesses indicated that Plaintiff had episodes of damaging property and threatening violence. (AR 265-66, 268, 270-71, 273.) However, as the ALJ stated, the medical record shows that Plaintiff's violent episodes were lessening in frequency and generally improving with medication. (AR 24.) For instance, Dr. Brar indicated in February 2014, March 2015, and May 2015, that Plaintiff was less angry as a result of his medications. (AR 402, 417, 433, 451, 453.) Also, as the ALJ indicated, Plaintiff reported "good impulse control and good attention and concentration," and mental status examinations revealed "good eye contact, appropriate attitude, normal speech, okay mood, full affect with fair-to-good insight and judgment." (AR 18, 24.) Further, as set forth above, the state agency physicians opined that Plaintiff had no limitations interacting and relating with others. *See supra* Part V.A.1.

The ALJ's finding that the four lay witness statements were inconsistent with the evidence in the record was a germane reason to reject them. *See*, *e.g.*, *see also Bettis v. Colvin*, 649 Fed. Appx. 390 (9th Cir. 2016) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009)) (finding that contradictory medical evidence is a germane reason for rejecting lay witness testimony); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999), amended by *Tidwell v. Apfel*, No. 97–35863, 1999 WL 27525 (9th Cir. Jan. 26, 1999) (explaining contradictory medical evidence and testimony about claimant's activities are clear and convincing reasons

for rejecting testimony of law witness); *see also Gonzales v. Astrue*, No. 1:10-cv-00657-SKO, 2011 WL 4500838, at *25 (E.D. Cal. Sep. 27, 2011) ("The Court is not tasked with considering the persuasiveness of the ALJ's reasons for rejecting third-party statements; rather, the Court reviews whether the ALJ provided reasons for rejecting the third-party statements that were germane to that witness."). Therefore, the ALJ provided sufficiently germane reasons for discrediting the third-party statements of Plaintiff's mother and aunt.

## VI. CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Lavelle Earl Lowe.

IT IS SO ORDERED.

Dated: **May 4, 2018**                                /s/ *Sheila K. Oberto*
                                                                        UNITED STATES MAGISTRATE JUDGE